LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
Fax: (212) 962-5037
anthonycecutti@gmail.com

March 31, 2020

**BY ECF & EMAIL**
The Honorable Laura Taylor Swain
United States District Judge                     **MEMO ENDORSED**
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**Re: United States v. Wilson et al; 20 Cr. 126 (LTS)**

Dear Judge Swain:

  I represent Miguel Belardo in the above matter. Mr. Belardo, 24, was arrested on February 20, 2020 and like all his co-defendants, is charged with participating in a narcotics conspiracy and possessing firearms. An initial appearance was conducted before the Honorable Barbara C. Moses. Mr. Belardo consented to detention without prejudice to make a later request for bail. I respectfully submit this letter in support of Mr. Belardo's application for an order granting his release, or in the alternative, a bail hearing. The Government opposes this request.

  Mr. Belardo is incarcerated at Westchester County Jail ("WCJ"). As an incarcerated person, he is at high risk for contracting COVID-19, a dangerous illness spreading rapidly across the world, country, and within New York State and New York City. The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The acute risk to Miguel Belardo given the conditions of incarceration, necessitates his temporary release on bail until this pandemic has ended. Additionally, his release pursuant to § 3141 is necessitated based on the rapidly changing public health crisis that imperils Mr. Belardo's physical health. *See* 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition" as one of the release factors to be considered in a bail application). Finally, under the current circumstances, it is presently impossible to prepare Mr. Belardo's defense.

  COVID-19 is impacting younger populations at alarming and increasing rates. Mr. Belardo's health and safety must be ensured. The only way to do so is for Mr. Belardo to be released now to the care and safety of his family, whose concerns have become agonizing. He is eager to return to his family and show Your Honor that he can be trusted to abide by all conditions of release and assist in the preparation of his defense. Accordingly, I respectfully

request that Mr. Belardo be released and live with his mother or other family members in the Bronx or Staten Island, under home detention, electronic monitoring and any other conditions Your Honor deems appropriate.

## I. The COVID-19 Outbreak Compels Mr. Belardo's Immediate Release

We are facing a serious and urgent public health crisis.[1] On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[2] On January 21, 2020, Washington State announced the first confirmed case of coronavirus in the United States.[3] Only two months later, COVID-19 infected over 33,018 people across the United States, leading to at least 428 deaths.[4]

The exponential rate of coronavirus infection is unparalleled. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases.  In a five-day period between March 15 and March 20, New York State experienced a 1,064% increase in new confirmed cases of COVID-19.[5] As of March 21, 2020 in New York City, there were 8,115 positive cases and 60 deaths resulting from the virus.[6]  Only a week later, New York has more confirmed cases of coronavirus than any other state in the country, with New York City having 30,765 cases and 672 deaths.[7]  In the last 24 hours, cases increased by 2,709 to 33,474 and deaths rose by 104 to 776.[8]  Westchester County has 8,519 cases, the second largest number in New York State.[9]  New York City and

---

[1] The research in this section was prepared by colleagues at the Federal Defenders of New York who are providing guidance and direction to CJA counsel.  I acknowledge and am grateful for their contributions and leadership.  As of March 30, 2020, New York had recorded more than 1,000 deaths and 52,000 confirmed cases of infection. New emergency medical sites were recently approved and will be in the Bronx, Brooklyn, Queens and Staten Island and a Navy ship with medical personnel and 1,000 beds arrived yesterday in New York from Virginia.  The Jacob Javits Center and areas of Central Park have been transformed into make-shift hospitals.  Additionally, there are ongoing discussions to quarantine the state and New York City.  With the New York health care system under great stress, yesterday, Governor Cuomo made a plea to out-of-state health care workers to "please come help us in New York now."  Experts all predict that the worst is yet to come.

[2] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[3] *First Patient With Wuhan Coronavirus Is Identified in the U.S.*, The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.

[4] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (Mar. 21, 2020), at https://nyti.ms/2U4kmud (updating regularly).

[5] *Watch How the Coronavirus Spread Across the United States*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.

[6] *Coronavirus*, New York City Health (Mar. 21, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).

[7] *Coronavirus*, New York City Health (Mar. 28, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).

[8] *Id.*

[9] New York State Department of Health: County by County Breakdown of Positive Cases, March 29, 2020 at 3:38

outer areas, are now the epicenter of the global pandemic.[10]

In response to this public health crisis, Governor Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[11] Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of over 500 people.[12] Westchester County executive George Latimer issued a local State of Emergency for Westchester County on March 16, 2020.[13] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to maintain 6 feet of distance between each other.[14] The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[15]

While adults over sixty years old and people with chronic medical conditions are at heightened risk for COVID-19, younger individuals are far from being immune from infection. Data from the Centers for Disease Control and Prevention (CDC) shows that nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[16] In New York, 18 to 49-year-olds comprise more than half of all cases in the state.[17] In New York City, 44% of individuals infected are 18 to 44,[18] and 57% are male.[19] It is clear that COVID-19 is also a serious concern

---

p.m.  https://coronavirus.health.ny.gov/county-county-breakdown-positive-cases

[10] *Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic*, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

[11] *At Novel Coronavirus Briefing, Governmor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz.

[12] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, The New York Times (Mar. 12, 2020).

[13] Westchester County Department of Correction at https://correction.westchestergov.com/civilian-visitation-suspended.

[14] *Novel Coronavirus (COVID-19),* New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[15] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[16] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[17] *Coronavirus Live Updates*, The New York Times (Mar. 22, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html (updating regularly).

[18] *Coronavirus*, New York City Health (Mar. 28, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).

[19] *Before Virus Outbreak, A Cascade of Warnings Went Unheeded*, The New York Times (March 19, 2020), at https://www.nytimes.com/2020/03/19/us/politics/trump-coronavirus-outbreak.html?action=click&module=RelatedLinks&pgtype=Article.

for younger individuals.  As stated by Dr. Wayne Tsuang, a pulmonary and critical care physician at the Cleveland Clinic, "this virus is impacting the entire population, and it's something the entire population should be responding to."[20]  For instance, Dez-Ann Romain, teacher and principal of the Brooklyn Democracy Academy, died on March 23, 2020 from COVID-19.[21]  She was only 36 years old and in good health.  Other young individuals are hospitalized and on ventilators.  Some will also die.

With tens of thousands of confirmed cases and over a thousand deaths in New York City and outer areas that indicate rapid community spread, every necessary action to protect vulnerable populations and the community at large must occur.  Incarcerated individuals are particularly vulnerable and are at great risk of contracting COVID-19 and receiving inadequate medical care.

### a. *Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus.*

"Prisons are petri dishes for contagious respiratory illnesses."[22] Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. On March 21, 2020, a correction officer at Westchester County Jail (WCJ) tested positive for the coronavirus.[23] The officer had contact with a sick family member and was directed to quarantine at home.[24] The effect on the population at WCJ remains to be seen, but as the chief physician at Rikers Island cautioned, "A storm is coming."[25]

Given what we know about COVID-19, a prison's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[26] But public health experts agree that incarcerated

---

[20] *Yes, COVID-19 Can Be Serious For Younger Adults, Too, CDC Reports Show*, USA Today, March 19, 2020 at https://www.usatoday.com/story/news/health/2020/03/19/coronavirus-illnesses-can-serious-young-adults-cdc-report/2874271001/

[21] *Dez-Ann Romain, Eductaor with Grit and Heart, Dies at 36*, New York Times (March 27, 2020) at https://www.nytimes.com/2020/03/25/nyregion/coronavirus-death-brooklyn-school-principal.html

[22] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[23] *Coronavirus: Westchester jail employee under quarantine after positive test*, lohud.com (Mar. 21, 2020), at https://www.lohud.com/story/news/local/westchester/2020/03/18/coronavirus-ny-westchester-jail-department-correction/2863733001/.

[24] *Id.*

[25] *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

[26] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*,

individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[27]

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[28] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[29] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[30]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[31] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[32] But the cases are not abating. Already, 167 inmates and 137 staff members have tested positive at New York City's jails.[33] Two correction staff members have died and a "low number" of inmates have been hospitalized.[34] The numbers show that inmates in New York City jails have an COVID-19 infection rate *seven* times that of the New York City population and *eighty-seven* times that of the United States population (emphasis added).[35] The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people

---

Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[27] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[28] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[29] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[30] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.

[31] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[32] *Id.*

[33] *"We're Left for Dead": Fears of Virus Catastrophe at Rikers Jail,* (Mar. 30, 2020) at https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html

[34] *Id.*

[35] *Coronavirus Infection Rate in NYC Jails 7 Times the Rest of the City,* MSNBC (March 26, 2020) at https://www.msnbc.com/all-in/watch/coronavirus-infection-rate-in-nyc-jails-7-times-the-rest-of-the-city-81260101982

housed and working in the jails is to rapidly decrease the number of people housed and working in them."[36]  The New York City Bar Association has called on "all actors in the criminal justice system" to "swiftly move to reduce the density at all New York City area jails and prisons to prevent or slow the spread of the virus."[37]

On March 29, 2020, the first known federal inmate, Patrick Jones, 49, died of COVID-19.[38]  He was incarcerated at a low-security federal prison in Oakdale, Louisiana.  It is inevitable that other inmates will also die from COVID-19 who are incarcerated in BOP facilities and other facilities that house federal inmates unless depopulation of prisons occur.

### b. The WCJ is unprepared for a coronavirus outbreak.

It is an illusion that WCJ will be able to keep the virus outside of the jail, or to engage in any effective quarantine practices once inside.  Even the best-equipped medical professionals on the outside have been unable to stop COVID-19.  Individuals at the WCJ, which houses pretrial detainees and sentenced inmates, or any prison or jail, are at serious risk of contracting COVID-19.  On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, WCJ suspended visits.  However, prohibiting visits to WCJ is insufficient to stem the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[39]

Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. To prevent new infections, the Centers for Disease Control and Prevention ("CDC") strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least 6 feet of space between people, and social distancing.

To date, the WCJ has not met even the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals, including Miguel Belardo, live in tight quarters with many others.  It is also unsanitary.  There is no hand sanitizer and shared showers are cleaned once per week.  In fact, during a video conference with Mr. Belardo on March 27, 2020, I observed inmates behind him gathering close to one another in an open area.  I

---

[36] *Id.*

[37] *Statement of the New York City Bar Association Urging Immediate Steps to Reduce Prison and Jail Populations to Prevent Spread of the COVID-19 Virus* at 2-3, available at https://s3.amazonaws.com/documents.nycbar.org/files/COVID_Prisons_Jails_Statement_FINAL.pdf

[38] *First Known Federal Inmate Dies of Coronavirus*, Reason (March 29, 2020) at https://reason.com/2020/03/29/first-known-federal-inmate-dies-of-coronavirus/

[39] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

also observed staff who did not appear to have taken any precautions – none were wearing gloves, masks or encouraging social-distancing.  Business at the jail seemed no different than pre-COVID-19, despite some restrictions.  The absence of precautions was alarming.

In addition to unhygienic living conditions, frequent movement between and within units at the WCJ over the past several weeks promises to aid the spread of the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "It is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff."[40] The WCJ will encounter the same obstacle to cabining the spread.  With each additional arrest and each movement of an inmate or staff person comes increased risk of spreading the virus in the WCJ; again, spreading it to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection, which has begun.

As reported by Mr. Belardo, inmates within his unit at WCJ, when not in an open space, are isolated in their own cell.  His unit is not cleaned regularly, and he has limited means to maintain his own personal hygiene.  Many inmates have been removed from units under the suspicion of COVID-19 infection.  Approximately 60 inmates were recently segregated in response to flu-like symptoms.  Several inmates have tested positive.  Same is true for staff.  And what is most terrifying is that Mr. Belardo (and any other inmate) is unable to protect himself against a potentially fatal virus.

Notwithstanding confirmed cases of coronavirus at the WCJ and growing concerns, the WCJ remains unprepared for an outbreak. The jail does not currently have the ability to test for coronavirus and there are no general screening protocols in place. Only if an inmate self-reports symptoms will they be screened for the virus. If symptomatic, the inmate is "isolated." However, a person does not need be symptomatic to infect others.  Given what we know about coronavirus, conditions of confinement inside prisons, and the lack of ability by WCJ, and prisons generally, to promote safety, inmates and staff are extremely concerned and scared.  One infected inmate or staff member can easily and quickly result in hundreds of others.

### c.  *As a person of color, Miguel Belardo is at an increased risk to receive inadequate medical care and treatment while incarcerated.*

Racism, explicit and implicit is pervasive in medical care.[41]  African-Americans and

---

[40] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[41] In 2017, a systemic review published in Academic Emergency Medicine gathered all the research on physicians that measured implicit bias with the Implicit Association Test and included some assessment of clinical decision making. Studies found an implicit preference for white patients, especially among white physicians, and a relationship between this bias and clinical decision-making.  *See Doctors and Racial Bias: Still A Long Way to Go*, New York Times (Feb. 25, 2019) at https://www.nytimes.com/2019/02/25/upshot/doctors-and-racial-bias-still-a-long-way-to-go.html

Latinos experience poorer health care access and lower quality of care than white Americans. Disparity in treatment has been well documented in a number of studies done on AIDS,[42] cardiology,[43] treatment for mental illness,[44] internal medicine,[45] pain treatment,[46] and hospital care.[47] There are significant differences in time spent, quality of care and quantity of medical visits between white individuals and individuals of color.[48] Whites are more likely to receive more, and more thorough, diagnostic work and better treatment and care than people of color. As stated in a 2014 report from the Robert Jonson Foundation, the nation's largest philanthropy dedicated to health, "Your health care depends on who you are … Race and ethnicity continue to influence a patient's chances of receiving many specific health care interventions and treatments."[49]

Individuals of color will face disproportionate consequences related to COVID-19. An increasing number will become critically ill or die from COVID-19. African-American and Latino inmates, such as Miguel Belardo, are particularly vulnerable to receiving inadequate medical care. During the present pandemic and our health care system severely stressed, they are at even greater risk of receiving poor or no medical care at all.

> **d. The federal judiciary has begun to set bail conditions for previously detained individuals in light of COVID-19.**

The judiciary has begun to recognize and address this exceptional and unprecedented crisis. In the Southern District, judges have begun to consider the risks of COVID-19 in every bail hearing and release previously-detained defendants, even in quite serious cases, based

---

[42] Daniel J. DeNoon, *AIDS Care Not Color Blind*, AIDS WEEKLY, Sept. 11, 1995, at 2.

[43] Kevin A. Schulman et. al., *The Effect of Race and Sex on Physicians' Recommendations for Cardiac Catheterization*, 340 NEW ENG. J. MED. 618 (1999).

[44] Jay C. Wade, *Institutional Racism: An Analysis of the Mental Health System*, 63 AM. J. ORTHOPSYCHIATRY 536 (1993).

[45] John Yergan et al., *Relationship between Patient Race and the Intensity of Hospital Services*, 25 MED. CARE 592 (1987).

[46] Charles S. Cleeland et al., *Pain and Treatment of Pain in Minority Patients with Cancer*, 127 ANNALS INTERNAL MED. 813 (1997); Vence L. Bonham, Race, Ethnicity, and Pain Treatment: Striving to Understand the Causes and Solutions to the Disparities in Pain Treatment, 29 J.L. MED. & ETHICS 9 (2001).

[47] Charles L. Bennett, *Racial Differences in Care Among Hospitalized Patients with Pneumocystis Carinii Pneumonia in Chicago, New York, Los Angeles, Miami, and Raleigh-Durham*, 55 ARCHIVES INTERNAL MED. 1586 (1995).

[48] U.S. COMMISSION ON CIVIL RIGHTS I, supra note 2, at 82-83.

[49] *Why Health Care is Different if You're Black, Latino or Poor*, Forbes (Mar. 5, 2015) at https://www.forbes.com/sites/robertpearl/2015/03/05/healthcare-black-latino-poor/#78ed11417869

largely upon the risk to them posed to them posed by incarceration. After having remanded defendant Dante Stephens less than two weeks earlier, Judge Alison Nathan in the Southern District of New York reversed herself "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." *United States v. Stephens*, 15 Cr. 95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. *Id.* Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail. *See United States v. Santiago Ramos*, 20 Cr. 04 (ER) (denying government's request for revocation and detention of defendant charged with wire fraud, despite government's allegations defendant had continued to commit felonious conduct and had violated his initial conditions of pre-trial release by seeking to defraud additional investors and communicating with witnesses and victims without counsel, due to the risk of the COVID virus)  *See also United States v. Baker*, 20 Cr. 125 (KMK) (releasing, after defendant was detained on consent without prejudice, defendant charged with conspiracy and possession with intent to distribute controlled narcotics substances) (March 24, 2020);  *United States v. Lopez*, 19 Cr. 323 (JSR) (March 23, 2020)(denying government's request for revocation and detention of defendant who pleaded guilty to conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime, finding that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," "the number of [coronavirus cases] has been increasing by a substantial percentage each day," the pandemic "creates a danger if [the defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States," and "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want"); *United States v. Almaleh*, 17 Cr. 25 (NSR) (releasing, with government consent, two elderly defendants charged with conspiracy to commit bank fraud, bank fraud, wire fraud, and false statements to the FDIC, because of high COVID risk of defendants. Defendants had previously been released on bail but were remanded to detention for continuing criminal conduct and violations of the terms of their release.) (March 22, 2020); *United States v. Vizzari*, 19 Cr. 767 (VSB) (releasing defendant awaiting sentencing after pleading guilty to possession with intent to distribute heroin and violation of parole in a prior conviction for possession with intent to distribute heroin, because his age and health conditions presented exceptional COVID risk) (March 20, 2020); *United States v. Brandon*, 19 Cr. 644 (GBD) (releasing on his own recognizance, over government's objection that defendant was a serial and continuous violator of the law, defendant awaiting sentencing on a guilty plea to escape from federal custody in failing to report to a halfway house, based on an underlying 24-month sentence for violation of his supervised release from a 2009 conviction for access device fraud and identity theft, because of COVID risk) (March 19, 2020); *United States v. Estime*, 19 Cr. 711 (NSR) (releasing defendant who is 33 years old with no medical issues and a felony narcotics history.  He had been remanded for several months after pleading guilty to a (b)(1)(B) narcotics conspiracy for importing a kilogram of cocaine from the Dominican Republic) (March 27, 2020).

So too in the Eastern District have the judges begun to view the bail calculus for defendants who were previously detained to have shifted in light of COVID-19.  Even defendants charged with serious and violent crimes have been released because of the current pandemic. *See, e.g., United States v. Eli*, 20 Cr. 50 (RJD) (RER) (releasing, over government's

objection, defendant charged with multiple robberies involving guns and drugs, because of COVID risk) (March 24, 2020); *United States v. Juan Plasencia*, 20 mj 205 (SJB) (releasing, through a joint stipulation of the parties, defendant charged with illegal possession of a firearm after having been previously convicted of a felony attempted armed robbery, and whose initial application for bail was denied for failing to present credible sureties to assure his appearance, because of the COVID pandemic) (March 23, 2020). *See also United States v. Barrett*, 19 Cr. 436 (KAM) (releasing, through joint agreement of the parties, defendant charged with Medicare and Medicaid fraud and conspiracy to defraud the United States, because of the COVID pandemic. Defendant was previously convicted of the same offense in 2016 and at his bail hearing had presented no credible sureties to ensure his appearance.) (March 13, 2020).

## II.     The Sixth Amendment Demands Mr. Belardo's Release

The conditions of confinement at the WCJ have gutted Miguel Belardo's Sixth Amendment right to the effective assistance of counsel. Until he is released, Mr. Belardo will continue to suffer violations of his constitutional rights.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. As the Second Circuit recently emphasized, "the right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "*shall provide* the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.117(a) (emphasis added).

A detention facility therefore violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In *Benjamin,* the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." 264 F.3d at 179. These circumstances, where the Second Circuit refused to dissolve a consent decree providing judicial supervision of legal visitation in City correctional facilities, are far less jarring than those Mr. Belardo has been forced to endure.

On March 13, 2020, the WCJ suspended visits. Since then, Mr. Belardo's only means of communicating with counsel is through paid and time-limited video-conferencing at specific times. While it is reported by WCJ that such conferences are unmonitored, they are not private. Inmates and staff are in proximity. Ultimately, Mr. Belardo is being deprived private, privileged conversation with counsel. This is inconsistent with the constitutional right to counsel. In *Wolfish v. Levi*, the Second Circuit held that the WCJ "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing

long delays, limiting the attorney's time with his client, and totally vitiating confidentiality." 573 F.2d 118, 133 (2d Cir. 1978) (holding the), *rev'd on other grounds,* 441 U.S. 520 (1979).

In addition to being unable to meaningfully meet with counsel, Mr. Belardo has already suffered a complete inability to review discovery to prepare his defense. It is anticipated that I will soon receive global discovery which is voluminous.[50] The Government has informed me that the initial global discovery will be approximately forty gigabytes of data. To date, only individual discovery has been provided to counsel. I have discussed with the Government the nature of the global discovery, which is expected to and will include, but not be limited to undercover buys, social media, prison calls, and NYPD reports. The initial disclosure is expected to be about 40 GB and does not include the social media evidence.  While we trust that the Government and Ms. de Almeida will produce the global discovery to Mr. Belardo, the conditions at the WCJ prevent Mr. Belardo from evaluating those materials. To review the materials, a computer is required.  However, Mr. Belardo does not have any access to the law library or the area designated to review discovery at the WCJ.

Further, in the likely event that infected cases increase at the WCJ, the entire facility will go on a total lockdown, further inhibiting Mr. Belardo's constitutional rights. For instance, at MDC Brooklyn, immediately after an inmate tested positive for the coronavirus on March 21, 2020, the facility went on lockdown indefinitely: No inmates are allowed into or out of the building for any reason, including court appearances. Certainly, we can expect this will be the case when COVID-19 cases increase at the WCJ. That event, and the ending of video-conferencing, will mark the complete evisceration of Mr. Belardo's right to counsel.

As the public health crisis rapidly evolves, so too does the judiciary's perspective on release. On March 18, 2020, Chief Judge McMahon granted an application for bail based on compelling reasons related to the current health crisis. Defense counsel had argued that "[a] complete cessation of visits at this critical time of preparation would make it impossible to adequately prepare for trial…." *United States v. Hudson*, 19-CR-496 (CM) (Mar. 13, 2020). Five days earlier, she had denied the request. *Id.*

In the throes of this public health crisis, the Court must release Miguel Belardo to protect his physical health.  Mr. Belardo remains innocent until proven guilty. Additionally, to mount and prepare a defense and have effective assistance of counsel, Mr. Belardo must be released from custody. This extraordinary moment requires judicial intervention to safeguard Mr. Belardo's constitutional rights.

### III.     The Bail Reform Act Requires Mr. Belardo's Temporary Release

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary for preparation of the person's defense* or for *another compelling reason*." 18 U.S.C. § 3142(i). There is no greater

---

[50] Because of the volume of discovery, the Court appointed Coordinating Discovery attorney, Julie de Almeida.

11

necessity for the preparation of a "person's defense" than access to counsel. And there is no more "compelling reason" than a person's physical health.

As an initial matter, detention prior to the trial is not the norm. It is imperative that courts reserve pre-trial detention as an exception to liberty as "it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7); *see Salerno*, 481 U.S. at 755 (suggesting that "detention prior to trial is the carefully limited exception" to liberty before trial). It follows that due to the crucial interests that are involved, a careful and "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951).

Presently, the only ability for me and Mr. Belardo to communicate is through time-limited and subpar quality video-conferencing. We struggle to have clear discussions because of poor technology and lack of privacy. Under the current crisis, Mr. Belardo does not have any access to the law library or the area to review discovery. Furthermore, there is no way we can review any of the voluminous discovery that Government will produce, meaningfully discuss his case, or prepare a defense for trial. Indeed, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." *United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community). *See also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

Should he be released, Mr. Belardo and I can connect and discuss his case and prepare his defense any day and 7 days a week by phone or videoconferencing that fits our schedule. Discovery not subject to the protective order can be mailed to him for his review.[51] The Government's evidence can be meaningfully discussed, and Mr. Belardo and I can have productive conversations as to his legal options. Presently and potentially for months to come, none of this is possible.

In *United States v. Rodriguez*, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'" *Id.*; *cf. Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has

---

[51] An application to modify the current protective order may be made if Mr. Belardo is released. The order presently does not allow a defendant to possess "sensitive disclosure material" outside the presence of counsel. Should a need arise where I believe it is necessary for Mr. Belardo to possess some or all of that material, I will contact the Government, and apply to the Court for a modification if the protective order if unresolved issues remain.

the statutory authority to protect [defendant's] access to counsel.").

At the very least, the Bail Reform Act demands that Mr. Belardo be released for the duration of the coronavirus outbreak.

## Conclusion

Miguel Belardo is presently at high-risk of contracting COVID-19 and is not immune from its' serious consequences. COVID-19 does not discriminate between young and old. Because of his vulnerability to infection, the WCJ cannot be expected to ensure Mr. Belardo's health and safety. Releasing Mr. Belardo now to his family while he is about prevention and safety. Once exposed to the virus, this opportunity is missed, and serious consequences may occur.

Mr. Belardo faces a significant prison sentence. This does not increase his risk of flight. Rather, it promotes his desire and intention to abide by temporary release conditions. Mr. Belardo understands that if he violates his release conditions, it will significantly harm the outcome of his case. Furthermore, and despite his criminal history, he is not a "danger" to his community. Having recently been released from prison, he yearns for the opportunity to show Your Honor that he can be trusted and that his criminal past is behind him.

The Court cannot ignore the restriction of Mr. Belardo's constitutional right to counsel and the substantial threat incarceration poses to Mr. Belardo's physical well-being. As the Second Circuit recently opined, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020) ("direct[ing] the District Court [to help] ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of [legal claims against the MDC, including Sixth Amendment violations] as these claims may be amended to address similar issues of access [to counsel] arising during the current public health emergency [COVID-19]").

Accordingly, I respectfully request that the Court issue an order releasing Miguel Belardo on bail. In the alternative, I respectfully request a bail hearing this week for Mr. Belardo.

Thank you for your consideration of this matter.

Respectfully submitted,

/s/

Anthony Cecutti

Cc: Assistant United States Attorney Adam Hobson (by email)

The Government must file its written response to the foregoing application by April 2, 2020, at 5:00 p.m. Medical or other confidential personal information may be redacted in the version filed on ECF. A complete courtesy copy must be provided to defense counsel and emailed to Chambers via SwainNYSDCorresp@nysd.uscourts.gov. Any reply, which must state whether the defendant, after consultation with counsel, consents to waive his appearance for a telephonic hearing to be conducted by the Court with counsel, must be filed by April 3 2020, at 3:00 p.m.
SO ORDERED.
/s/ Laura Taylor Swain, USDJ 3/31/2020